Merle Joy Turchik, AZ Bar No. 011130
TURCHIK LAW FIRM, P.C.
2205 E. Speedway Blvd.
Tucson, AZ 85719
merle@turchiklawfirm.com
Telephone: (520) 882-7070
Facsimile: (520) 203-0175

David Sanford (D.C. Bar No. 457933, *Pro Hac Vice forthcoming*)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue SE, Suite 300
Washington, D.C. 20003
dsanford@sanfordheisler.com
Telephone: (202) 499-5201
Facsimile: (202) 499-5199

*Attorneys for Plaintiff and the EPA Collective Action Class*
*[Additional Attorneys Listed After Signature Page]*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Katrina Miranda, on behalf of herself and all others similarly situated<br><br>       Plaintiff,<br><br>vs.<br><br>Arizona Board of Regents,<br><br>       Defendant. | Case No.:<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Katrina Miranda, Ph.D., by and through her undersigned counsel, brings this class and collective action in her individual capacity and on behalf of all others similarly situated, against Defendant Arizona Board of Regents ("ABOR" or "the Board") to redress systematic gender discrimination in employment. Plaintiff alleges upon knowledge concerning herself and her own acts, and upon information and belief as to all other matters, as follows:

1

## I.   OVERVIEW

1.    Defendant ABOR engages in systematic discrimination in pay and promotions against female faculty members in the College of Science. Female science professors are routinely paid significantly less than their male counterparts, with men typically earning higher salaries. Moreover, women are disproportionality concentrated at the Assistant and Associate Professor levels and denied promotions to Professor. These pronounced and systematic disparities are the direct result of college-wide policies and practices – including denying women equal access to resources and leadership opportunities and allowing a handful of male administrators, principally the Dean of the College of Science, to exercise unilateral control over pay and promotions.

2.    Dr. Miranda is a tenured Associate Professor in the Department of Chemistry and Biochemistry (the "Department") in the College of Science (the "College") at the University of Arizona (the "University"). Dr. Miranda has suffered substantial pay disparities as compared to her male counterparts, and the University has failed to promote her in an equivalent manner to these male peers.  Plaintiff brings this action on behalf of similarly situated female science professors who have likewise suffered from Defendant's discriminatory policies and practices.

3.    Dr. Miranda's experiences are emblematic of these prevailing patterns and trends at the College.  Despite her remarkable credentials and achievements, her pay has languished at inordinately low levels for years, and she has been denied a long-earned promotion to Professor.

4.    Dr. Miranda's research and service have been recognized by the University and the scientific community at large.  She has been evaluated as "exceeds expectations" or "far exceeds expectations" almost every year and has won multiple awards in recognition of her research.

5.    Dr. Miranda has also contributed significant service to the University through participation in academic committees and external professional organizations.

6.    Despite Dr. Miranda's strong performance and service that has been

recognized within and outside the University, the University dramatically underpaid Dr. Miranda relative to her male colleagues by at least tens of thousands of dollars. Through publicly available salary information, Dr. Miranda learned that she has been underpaid by $9,000 to $36,000 per year from 2016 to 2018 alone compared to her male colleagues who have similar or lesser seniority and performance.

7.     On information and belief, Dr. Miranda's female colleagues in the College of Science were also underpaid relative to their male counterparts. On average, female science professors earn less than male science professors.

8.     This pay disparity is a direct result of policies and practices implemented by the College and University leadership. Female Professors in the College of Science at the University earn less than male Professors. They are also subjected to humiliating and demeaning treatment by the University's male leadership to which their male peers are not subjected and are denied equal access to resources. For example, female professors routinely receive fewer research assistants and lesser mentoring opportunities than their male counterparts.

9.     When Dr. Miranda complained about the pay disparity, the University unlawfully retaliated against her by reducing her laboratory space, requiring her to waive a prerequisite to a course, and removing her from instructing a course she created.

10.     The University has a history of failing to promote women within the College of Science. For example, in the Department of Chemistry and Biochemistry, nearly 50% of the Associate Professors are women while only 12.5% of full professors are women. Similarly, Dr. Miranda has only seen one woman receive a promotion to Professor during her tenure.

11.     In accordance with these established patterns, the University denied Dr. Miranda a promotion to Professor on the basis of her gender. The Department of Chemistry and the University held Dr. Miranda to a stricter standard than her male colleagues, creating irregularities in the review process. Ultimately, the Dean of the College and Provost of the University disregarded faculty recommendations to grant her the promotion and instead

denied the promotion without substantial justification.  Dr. Miranda appealed the decision to the University President, complaining that her review process was unfair and indicative of gender bias.  However, President Robert Robbins ignored her complaints and ultimately denied her appeal.

12.    Upon information and belief, other female professors in the College have been similarly denied promotions based on their gender.

13.    This action arises out of the University's systematic discriminatory treatment of its female professors on the basis of their gender.  The University discriminates against female Professors in the College of Science through its policies, practices, and procedures with respect to compensation, in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA") and compensation and promotion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII").

14.    On behalf of herself and all others similarly situated, Plaintiff Miranda requests declaratory and injunctive relief to redress the University of Arizona's pervasive discriminatory employment policies, practices, and procedures, including its retaliation against her for reporting such discriminatory misconduct.  Plaintiff further seeks for herself, and all others similarly situated, back pay; front pay; compensatory damages; nominal and liquidated damages; and attorneys' fees and costs.

## II.    THE PARTIES

### A.    Plaintiff Katrina Miranda

15.    Plaintiff Katrina Miranda resides in Tucson, Arizona, and is a citizen of the United States.  She has been an employee of the University of Arizona since November 2002.

### B.    Defendant Arizona Board of Regents

16.    Defendant Arizona Board of Regents is a corporate entity created by state law for the purpose of administering Arizona's public universities.  Its headquarters are at 2020 North Central Avenue, Suite 230, Phoenix, Arizona.

17.    The University of Arizona, a public university located in Tucson, Arizona, is

a legal subdivision of ABOR.  At all relevant times, ABOR controlled the University, which has been Dr. Miranda's employer within the meaning of all relevant statutes.

18.     The University employs more than 15,000 individuals.

**C.     Administrative Exhaustion**

19.     Plaintiff Miranda filed a timely charge with the United States Equal Employment Opportunity Commission ("EEOC") on February 22, 2018.  Dr. Miranda received her right to sue to bring claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C §§ 2000e *et seq.* ("Title VII") on September 5, 2018.

**III.   JURISDICTION AND VENUE**

20.     The U.S. District Court for the District of Arizona has personal jurisdiction over Defendant because Defendant's offices are headquartered in Arizona, Defendant conducts business in Arizona, and the acts complained of and giving rise to the claims alleged herein occurred in Arizona.

21.     This Court has original subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 and § 1343 because this action involves claims brought under the EPA and Title VII.

**IV.   FACTUAL ALLEGATIONS**

**A.     The University of Arizona**

22.     The Arizona Constitution established the twelve-member Arizona Board of Regents as the governing body for the state's public university system, including the University of Arizona, to provide management and direction to the state's higher education institutions.

23.     Founded in 1885, the University of Arizona is one of the country's leading public universities.  As a premier research institution, the University brings in more than $606 million annually in research investment and has an economic impact of $8.3 billion annually in the state of Arizona.  With over 15,000 employees for the 2016-2017 academic year, the University is one of the largest employers in southern Arizona.

24.     As the University's chief academic officer, the Provost is responsible for

promoting the University's mission in education and research.  From August 2012 until his resignation in January 2018, Dr. Andrew Comrie served as Provost and Senior Vice President for Academic Affairs, initially as an interim Provost for the 2012-2013 academic year and as Provost from 2013.  As Provost, Dr. Comrie was responsible for approving compensation and promotions for Professors in the College of Science.

25.     From 2000 until present, Dr. Joaquin Ruiz has served as the Dean of the College of Science.  As Dean, Dr. Ruiz is responsible overseeing all faculty within the College of Science, evaluating applications for tenure and promotion and making associated recommendations to the University, and setting professors' pay.

**B.     Dr. Katrina Miranda**

26.     Dr. Miranda earned a Bachelor of Science in Chemistry from Northern Arizona University in 1989 and a Ph.D. in Inorganic Chemistry from the University of California, Santa Barbara, in 1996.

27.     In November 2002, Dr. Miranda joined the University as an Assistant Professor of Chemistry.  She was granted tenure and promoted to Associate Professor in 2008.  Her performance has been evaluated as "exceeds expectations" or "far exceeds expectations" almost every year since joining the University.

28.     Dr. Miranda's academic research focuses on identifying critical factors and markers of disease development as well as harnessing signaling mechanisms and modulating key targets for the treatment of cancer, heart failure, pain, and alcoholism.

29.     Throughout her academic career, Dr. Miranda has received numerous awards and honors in recognition of her accomplishments from the University of Arizona and the scientific community at large.  Within the University of Arizona, Dr. Miranda received the Graduate and Professional Student Council Achievement Award for Outstanding Mentor of Graduate/Professional Students in 2010, the College of Science Distinguished Advising Award in 2014, and a University of Arizona Foundation Award in 2015 in recognition of her research and contributions to the academic and Tucson communities.  In 2008 Dr. Miranda won the Presidential Early Career Award for Scientists, which is the highest honor

bestowed by the U.S. government on outstanding scientists and engineers beginning their independent careers.   In addition, Dr. Miranda was awarded the Fellows Award for Research Excellence by the National Institute of Health in 2001, and the National Science Foundation's Faculty Early Career Development Program (CAREER) Award in 2007.  In 2013, the American Association for the Advancement of Science honored her as a Fellow, a national distinction awarded to individuals who have made significant contributions to the advancement of science or scientific application. Upon information and belief, Dr. Miranda was the youngest professor within the Department over the past several decades to have received this commendation.

30.     On top of her scholarly work and recognition, Dr. Miranda has contributed to the intellectual life of the University through participating in committees and holding leadership positions, as well as mentoring students. Dr. Miranda was given the role of Assistant Chair for Education and Assessment in 2011 and has served on numerous committees. Since joining the University in 2002, Dr. Miranda has served on approximately nine to ten committees per academic year. As Assistant Chair, she founded and chaired the Undergraduate Advising Committee and Undergraduate Lab Course Committee in Chemistry and Biochemistry; established the Lab Assessment Committee for Chemistry and Biochemistry; and launched the Adjunct Professional Development Committee in Chemistry and Biochemistry.

**C.     The University Has Engaged in a Widespread Pattern of Pay Discrimination Towards Women in the College of Science**

31.     At the University, apart from promotions, there are two major avenues for a professor to receive a salary increase – merit increases and retention bonuses. Each of these avenues have led to widespread pay discrimination against female professors in the College of Science. As a result, female science professors, such as Dr. Miranda, typically make significantly less than their similarly-situated male counterparts.

32.     Merit increases occur when the University distributes funds for salary increases to the deans of the various colleges. The dean of each college then divides those

funds up between the departments. The department heads report back with a list of recommended salary increases. The dean of the college then makes decisions on raises.

33.     Within the College of Science, these increases have disproportionately gone to male professors. Dean Ruiz – with input from the department heads – makes pay decisions that are disconnected from meaningful standards or metrics and are thus entirely opaque. Professors' annual performance reviews are not considered when making merit raise decisions. The University purports to have criteria for merit salary increases, such as quantity and quality of publications, H-index, and grant money brought in. However, Dr. Miranda has and observed that the Dean fails to follow consistent criteria and exercises pay-setting authority in a virtual black box. Women are routinely disfavored.

34.     Retention bonuses are also distributed along gender lines within the College of Sciences. Traditionally in academia, a professor will approach administration after receiving a competing job offer, and the university will offer a retention bonus to bring the professor's salary in line with the competing offer. At the College of Science, however, male professors have often approached Dean Ruiz for and received retention bonuses even without a competing job offer. In contrast, the College has declined to provide several female professors retention bonuses when they had a competing job offer; unsurprisingly such professors chose to leave the University. The marked discrimination in retention bonuses has become so notorious that female professors have come not to expect one.

35.     As a result of these practices, the pay of female professors in the College of Sciences has languished in relation to their male peers.

**D.     In Accordance with These Policies and Practices, the University Discriminated Against Dr. Miranda in Compensation**

36.     Dr. Miranda is a victim of the discriminatory practices prevailing at the College, and her pay has suffered as a result. She has earned an annual salary of approximately $97,000 for the 2015-2016 academic year, $99,714 for the 2016-2017 academic year, and $100,214 for the 2017-2018 academic year.

37.     Based on publicly available salary information, Dr. Miranda learned that she

has been underpaid by $9,000 to $36,000 every year compared to her male colleagues who have worked for similar lengths of time at the University and received tenure around the same time as she did.

38.     For example, the University paid a male Professor of Chemistry an annual salary of $130,500 for the 2016-2017 and 2017-2018 academic years – almost $30,000 more than Dr. Miranda earned – even though he joined the University and received tenure the same year as Dr. Miranda.

39.     Similarly, the University paid a male professor of Chemistry, who had just one more year of experience at the University than Dr. Miranda, a base salary of $136,248 for the 2016-2017 and 2017-2018 academic years, approximately $36,000 more than Dr. Miranda earned.

40.     Upon information and belief, Dr. Miranda has a stronger publication record than both men and has served on at least a comparable amount of, if not more, committees. Neither men have held leadership roles within the Department, whereas Dr. Miranda has served as Assistant Chair.

41.     Within the scientific community, the H-index is a tool used to quantify an individual's research output, measuring both scientific productivity and the scientific impact of the publication.  Dr. Miranda's H-index score is almost twice that of both male professors – 41 compared to 18 and 29 – and citations of her work are respectively five-times and 2.8-times higher.

42.     Not only did the University fail to compensate Dr. Miranda commensurately with her male peers, but the University also paid less experienced male professors significantly more than her.  A male professor of Chemistry earned an annual salary of $130,500 for the 2016-2017 and the 2017-2018 academic years – almost $30,000 more than Dr. Miranda earned – even though he had joined the University and received tenure two years after her.  Compared to this male professor, Dr. Miranda has a comparable H-index and citation count for her research and has contributed more to the University through her service on various committees and programs.

43.     In 2011, the University gave this male professor of Chemistry a pay raise of $48,000, bumping his salary to $120,000.  Notably, this raise occurred just one year after he received tenure and his promotion from Assistant Professor to Associate Professor.  In contrast, at the time, Dr. Miranda made an annual salary of $91,500; $28,500 less than her male colleague.

44.     In response to this pay increase, in 2011 Dr. Miranda, along with other Associate Professors, complained to their then-direct supervisor, Department Head Mark Smith, about their pay. Department Head Smith told Dr. Miranda to be "patient" and assured her that all Associate Professors in the Department would eventually receive a similar pay raise. However, despite Dr. Miranda's significant contributions to the University and excellent performance, she has not received a substantial pay bump in the last seven years.

45.     Every year since 2011, the University has failed to allocate this promised salary raise to female Associate Professors, allowing significant gender-based pay disparities to accrue over time. Since 2011, the University has granted raises to male but not to female Associate Professors in her Department. Frustrated by the dismissal of her pay concerns, Dr. Miranda complained to the University's Office of Institutional Equity in December 2017. Specifically, Dr. Miranda reported that female Associate Professors have yet to receive a raise comparable to their male colleagues.  Despite several conversations with the Office of Institutional Equity, the University has still failed to act.

**E.      The University Systematically Discriminates Against Female Science Professors in Promotions**

46.     Within the University, there are two classes of tenured professors – Associate Professors and Professors. An Associate Professor seeking a promotion to Professor submits an application to her department head. The professor's candidacy is evaluated by a reading committee that makes a recommendation to the department head.  The decision-making process escalates from the department level to the dean of the college and ultimately to the University Provost. Each stage represents a potential chokepoint through

1   which the candidate must pass, giving central College and University administrators
2   authority over the promotions of all professors in the College of Science. The Provost has
3   final say on applications and bases decisions on the applicant's materials and the preceding
4   votes and recommendations – with the outcome at each successive level of the process
5   given increasing weight.

6         47.    The University refuses to promote female professors within the College of
7   Science at commensurate levels to their male peers. Since Dr. Miranda was hired, the
8   Department of Chemistry and Biochemistry has had about thirty tenured faculty members,
9   the overwhelming majority of whom are men. As of the 2018–2019 academic year, one
10  fifth of tenured faculty members in Dr. Miranda's department are female, including herself.
11  Among the tenured faculty, disproportionately more women are Associate Professors than
12  Professors, reflecting a pronounced pattern of discrimination in promotions. Around 50%
13  of Associate Professors are women whereas only 12.5% of Professors are women.  Similar
14  patterns exist across the College of Science.

15        48.    Throughout Dr. Miranda's sixteen-year employment at the University, she
16  has observed the University promote only one female faculty member to full Professor in
17  her department.  Moreover, Dr. Miranda is aware of at least five female professors in the
18  Department of Chemistry and Biochemistry – all but one of whom were tenured – leave
19  the University in part as a result of the discriminatory environment fostered within the
20  College of Science.

21  **F.    The University's Review Process for Promotions is Itself Biased Against**
22  **     Women**

23        49.    Even more invidious is the gendered nature of the evaluation process. For
24  example, review committees routinely praise and reward male professors as "leaders" for
25  engaging in research collaborations with their peers, whereas female professors such as Dr.
26  Miranda were criticized and penalized for doing the very same thing. Reviewers write off
27  women's efforts and contributions to collaborative projects.

28        50.    Further, the University's policies and practices which have placed increasing

importance on teaching evaluations are themselves discriminatory. Teaching evaluations routinely favor male professors even when male and female professors provide equivalent instruction. The University's decision to place emphasis on a metric it knows is biased further disadvantages female applicants.

**G.    The University Discriminated Against Dr. Miranda when She Sought Promotion to Full Professor**

51.    In April 2016, Dr. Miranda notified the Dean of the College of Science, Joaquin Ruiz, that she wanted to be considered for a promotion to Professor. Unsurprisingly, Dr. Miranda suffered discrimination in the review of her application, and the University ultimately denied her the promotion despite her outstanding qualifications.

52.    For example, at the departmental level, the reading committee failed to conduct a holistic evaluation of her research by narrowly construing her field of research and excluding many of her publications from consideration. The reading committee also falsely concluded that her research was not "independent" or significant in her area of research, even though Dr. Miranda has one of the highest H-Index scores within the Department. Such arbitrary exclusions were not applied to Dr. Miranda's male peers.

53.    The reading committee also improperly focused on two of the lowest teaching evaluations Dr. Miranda received throughout her career instead of taking her overall teaching score under consideration and recognizing that the two low ratings were clear outliers. This is yet another avenue of increased scrutiny not faced by male professors.

54.    Moreover, the reading committee inappropriately characterized Dr. Miranda's service to the University only as "adequate," although it was abundantly evident from her dossier that she routinely participates on multiple Department and University committees. Not only has Dr. Miranda founded and chaired several committees, but she has been recognized by many individuals and organizations, including President George W. Bush and the College, for her activities and leadership.

55.    In addition, the reading committee improperly gave short shrift to Dr. Miranda's glowing letters of reference, which should have been the most important element

of her candidacy.

56.     Upon information and belief, other female professors have been subjected to similar heightened scrutiny, moving goalposts, and differential treatment.

57.     While the committee treated Dr. Miranda selectively and unfairly, the ultimate locus of discrimination occurred at the college-wide level. Department Head Serio elected to move Dr. Miranda's candidacy forward to the College, and the College faculty recommended to grant the promotion. However, Dean Ruiz and then-Provost Andrew Comrie determined to deny Dr. Miranda a long-due elevation to Professor. But Dr. Miranda was eminently qualified for promotion, particularly in relation to similarly-situated males who became full professors.

58.     Upon information and belief, this sequence of events represents a discriminatory pattern and practice; other female professors in the College of Science have had promotion approvals by College faculty overturned by Dean Ruiz and Provost Comrie. For example, another female Associate Professor in the College of Science applied for a promotion to Professor in 2017, and her application followed a similar pattern. Moreover, the ranks of tenured Professors in the College of Science are disproportionally comprised of men.

59.     On May 26, 2017, Dr. Miranda filed an appeal with then-President Hart detailing the discrimination she had suffered during her application and review process. On August 17, 2017, President Robert Robbins denied Dr. Miranda's appeal without seriously considering the issues of bias she had raised.

60.     Dr. Miranda's experiences are emblematic of discrimination suffered by female professors in the College of Science.

**H.     The University Has Engaged in a Widespread Pattern of Discriminatory Treatment Toward Female Professors in the College of Science, Including Systematic Discrimination in the Terms and Conditions of their Employment**

61.     Pay and promotion discrimination is part of a broader pattern of

discrimination against female Professors in the College of Science. This discriminatory treatment begins the moment women enter the College of Science. Female professors receive less mentoring from more experienced professors and are assigned fewer research assistants than their male peers. Both of these practices disadvantage female professors from the start of their careers.

62.     Based on Dr. Miranda's observations and experiences, she believes that the College discriminates against its female employees with regard to assignments and promotions in a manner that compounds the gender-based disparities in pay. In the Department of Chemistry and Biochemistry, Department Head Miesfeld implemented a policy against permitting Associate Professors to serve in particular leadership roles. Because female professors are disproportionately designated as Associate Professors, this practice has a disparate effect on female professors in the department. Dr. Miranda is aware that the Department made an exception for at least one male Associate Professor.

63.     When faculty members learned of this policy in January 2018, they voted to end it.  However, the policy change does not make up for the years of lost opportunities for women to serve in leadership roles, further exacerbating the gender bias already widespread throughout the College. For example, Dr. Miranda was removed from a leadership position because of this policy. Moreover, the policy acted to prevent female Associate Professors from obtaining the leadership experience necessary for promotion to Professor. The policy thus created a Catch-22 of needing to be promoted to obtain a leadership opportunity but needing a leadership role in order to be promoted.

64.     These discriminatory hurdles – from decreased support to increased scrutiny – disadvantage female professors from the start of their careers and only compound over time. These cascading problems effectively keep female professors from achieving parity with their male counterparts within the College of Science.

**I.     The University Has Long-Standing Knowledge of Discrimination within the College of Science, but Has Deliberately Failed to Rectify it**

65.     In a recent campus climate survey released by Dean Ruiz in March 2017, the

data revealed a pervasive problem of bias against women at the College of Science and considerable, widespread unhappiness among the female faculty members in the Department of Chemistry and Biochemistry. To Dr. Miranda's knowledge, neither Dean Ruiz nor the University has taken any significant steps to rectify these concerns. Furthermore, a male professor tasked with writing another Department climate survey report disclosed to Dr. Miranda that data on complaints of gender discrimination were left out of the final report. Upon information and belief, Dr. Miranda believes that the information was intentionally suppressed by the University.

66.     In fact, at least three surveys commissioned by the University or College of Science have reported concerns of gender discrimination and widespread dissatisfaction among female faculty. The College conducted a climate survey report during the fall semester of 2016. The University conducted an Academic Program Review of the Department and released a report on November 28, 2017. The University also conducted a COACHE survey during the spring of 2018. All three of these surveys reported widespread concern by women about discriminatory practices negatively affecting their careers. Female respondents also reported deep acrimony within the College. Despite these reports, the University, the College of Science, and the Department have repeatedly failed to act to address the concerns of female professors.

67.     Remarkably, the 2017 Academic Program Review determined that the Department was so acrimonious and dysfunctional that the committee refused to complete its review. Instead of taking any significant action, the University left it to the very actors who had created a discriminatory environment to remedy that discrimination.

68.     This pattern of inaction persists at the College level as well. Dr. Miranda has complained annually to Dean Ruiz about discrimination within the Department only to be met with vague platitudes. Time and time again, female professors' complaints are met with silence and inaction.

**J.      The University Retaliated Against Dr. Miranda for Engaging in Protected Activity**

69.     The University has persistently retaliated against Dr. Miranda for raising complaints about gender discrimination and institutional equity. Such retaliation towards Dr. Miranda and others who have raised similar concerns sends a message to female faculty that they should remain silent about discrimination and thus insulates the College's and University's discriminatory practices.

a.     **The University Failed to Remedy Retaliation Against Dr. Miranda Despite Finding She Had Suffered Discrimination**

70.     During the fall semester of 2014, Department Head Miesfeld unilaterally instructed Dr. Miranda to waive a prerequisite for one of her spring semester courses, which Dr. Miranda refused to do because it went against department policy. Department Head Miesfeld immediately removed Dr. Miranda as a course instructor for refusing to waive these prerequisites. Dr. Miranda is not aware of any male professor within her department who has been removed from teaching a course in this fashion.

71.     Dr. Miranda immediately raised concerns about Department Head Miesfeld's actions to Dean Ruiz. When Dean Ruiz failed to take any action, Dr. Miranda filed a complaint with the University Grievance Clearinghouse Committee on December 23, 2014. Dr. Miranda asserted that she had been wrongfully removed from teaching based in part on gender bias.

72.     The Grievance Clearinghouse Committee assigned the Committee on Conciliation to investigate Dr. Miranda's grievance and facilitate a resolution.  During proceedings before the Committee on Conciliation, Dr. Miranda raised further concerns about gender inequity and bias within her Department including demeaning comments made by Department Head Miesfeld about a potential female candidate for a faculty position.

73.     The Committee on Conciliation found that her complaint had merit and warranted an apology. As it notes, the "discretionary reversal in accepted Departmental practice regarding faculty control of prerequisite enrollment associated with this case" appeared to support Dr. Miranda's contention that her removal from teaching was a

"punitive" action. Notably, the Committee recommended that the gender bias and inequity in the Department that Dr. Miranda complained about "be given sufficient consideration and redress" because the Committee members had observed gender bias at play during in-person meetings with the parties. In particular, the Committee members commented that "it was obvious . . . from verbal and body language that at least some of the interactions from Drs. Miesfeld and [Associate Department Head] Sanov reflected gender bias" and that the Department's actions towards Dr. Miranda were "perhaps impacted by gender privilege." They also observed that Miesfeld and Sanov had a "tendency … to 'team up' in reaction to [Dr. Miranda's] complaints." The Committee stated that it was "imperative" that the Department follow its recommendations to address the gender imbalance within the Department and mitigate inequalities

74. On March 24, 2015, the Committee concluded that it was unable to reach a solution amenable to both Dr. Miranda and Department Head Miesfeld and forwarded the case to the Committee on Academic Freedom and Tenure on April 20, 2015. The Committee on Academic Freedom and Tenure was established to investigate internal grievances brought by or against University faculty.

75. In her petition to this Committee, Dr. Miranda complained that Department Head Miesfeld's actions violated her academic freedom under the University's academic freedom policy and that he had acted improperly with gender bias, as the Committee on Conciliation had previously acknowledged.

76. On November 6, 2015, the Committee on Academic Freedom and Tenure found that while academic freedom had not been violated. However, it recommended that the Department conduct training workshops focused on collegiality and address its departmental culture.

77. Dr. Miranda appealed this decision. On January 15, 2016, President Hart refused to find that Dr. Miranda's academic freedom had been violated. Instead of addressing Dr. Miranda's substantiated complaints of gender bias and the recommendations of the University's Committees, Dr. Hart instructed her to direct her

concerns to the Office of Institutional Equity.

**b.    The College of Science Was Similarly Unwilling to Remedy Discriminatory and Retaliatory Conduct Against Dr. Miranda**

78.    In August 2014, Dr. Miranda complained to Dean Ruiz about the lack of opportunities for female scientists, including students and professors. In particular, she stated that the Department frequently overlooked female professors for leadership roles. Dr. Miranda also noted that the Department failed to select female graduate students – who composed about 40% of the program – for its research symposia, in which students present their research for opportunities to win substantial grant money. Though Dr. Miranda complained about this issue to Dean Ruiz on at least five occasions since 2014, he failed to substantively address the gender imbalance in these areas.

79.    Following Dr. Miranda's complaint of gender bias in 2014, Department Head Miesfeld began retaliating against her by marginalizing her within the Department, which has continued to this day. For example, since Dr. Miranda stepped down as Assistant Chair in 2014, Department Head Miesfeld has not appointed her to any other leadership role, which placed Dr. Miranda at a disadvantage for promotion. Despite his lack of support, Dr. Miranda continued to serve on at least four committees per academic year.

80.    Department Head Miesfeld has continued his campaign of retaliation against Dr. Miranda by removing her from courses that she typically teaches. In the spring of 2017, he took away Dr. Miranda's professional development class, which she had created, without consulting her, purportedly because Dr. Miranda had taught the class long enough. Upon information and belief, no male professor has ever been removed from a course because he had taught it "long enough." Since no other professor in the Department had expressed an interest in teaching her class at the time, upon information and belief, Department Head Miesfeld had to go to great lengths to find a replacement instructor. He ultimately assigned a male professor to this course.

81.    Further, on or about November 2017, Department Head Miesfeld announced his intention to take away Dr. Miranda's lab and give it to one of her male colleagues.

During Dr. Miranda's sixteen-year tenure at the University, no other professor was forced to give up his or her lab in this fashion.

82.     On June 6, 2018, Department Head Miesfeld again informed Dr. Miranda that she would need to move out of her lab. Department Head Miesfeld did not offer Dr. Miranda a replacement lab, which would substantially impact her ability to conduct research in her field.

**V.     Class Action Allegations**

83.     Class Representative Katrina Miranda and the class of female employees she seeks to represent have been subjected to a pattern and practice of gender discrimination in the College of Science, and to employment policies and practices which have had a continuing, unlawful disparate impact on them and their employment opportunities. Such gender discrimination includes (a) paying female professors less than their male counterparts; (b) providing unequal access to resources and professional support; and (c) denying female professors promotion and advancement opportunities comparable to male professors.

84.     The discriminatory employment practices at issue are systemic and College-wide. They stem from common employment policies, practices, and procedures that cause female professors to regularly suffer discriminatory outcomes. For example, discriminatory compensation policies and practices within the College of Science include: (i) a black box system for increasing professor compensation in which the Dean unilaterally determines salary increases; and (ii) a system of retention pay raises that overtly favors male professors. Examples of discriminatory promotion policies and practices include giving the Dean of the College of Science and Provost of the University unilateral discretion to deny female professors promotions they have earned.

85.     It is the University's standard operating procedure to discriminate against female professors in the College of Science. The University's employment policies, practices, and procedures are not unique or limited to any department within the College; rather, they apply uniformly and systematically to female professors in the College of

1  Science, causing a pattern and practice of discrimination throughout all departments.

2     86.    The University's compensation and promotion policies, practices, and

3  procedures have had a disparate impact on the Class Representative and the members of

4  the class. Such policies, practices and procedures are not valid, job-related, or justified by

5  business necessity.

6     87.    Because of Defendant's pattern or practice of gender discrimination, the

7  Class Representative and class she seeks to represent have been adversely affected and

8  have experienced harm, including the loss of compensation, promotion and other

9  advancement opportunities, employment benefits, and non-economic damages.

10     88.    The Class Representative and the class pursue this suit as their only means

11 of securing adequate and comprehensive relief from Defendant's discriminatory practices.

12 The Class Representative and the class have suffered, and will continue to suffer,

13 irreparable injury from the University's ongoing, unlawful policies, practices, and

14 procedures as set forth herein unless those policies, practices, and procedures are enjoined

15 by this Court.

16 **A.    General Facts Relevant to Class Claims and Class Definition**

17     89.    The Class Representative seeks to maintain claims on her own behalf and on

18 behalf of a class of current and former female professors in the College of Science at the

19 University.

20     90.    The class consists of all female professors who are, or have been, employed

21 by the University of Arizona in the College of Science during the applicable liability period

22 until the date of judgment. Upon information and belief, there are approximately 80 such

23 professors in the proposed class.

24     91.    The Class Representative seeks to represent all of the female professors

25 described above.  The systematic and disparate impact gender discrimination described in

26 this Complaint has been, and is, continuing in nature.

27 **B.    Efficiency of Class Prosecution and Common Claims**

28     92.    Certification of a class of female professors is the most efficient and

economical means of resolving the questions of law and fact that are common to the claims of the Class Representative and the proposed class.

93.     The individual claims of the Class Representative require resolution of the common question of whether the University has engaged in a systemic pattern and/or practice of gender discrimination against female professors. The Class Representative seeks remedies to eliminate the adverse effects of such discrimination in her life, career and working conditions, and in the lives, careers, and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.

94.     Plaintiff has standing to seek such relief because of the adverse effect that such discrimination has had on her individually and on female professors generally. The University caused Plaintiff's injuries through its discriminatory practices, policies, and procedures, as well as its disparate treatment of employees who are female. These injuries are redressable through systemic relief, such as injunction, and other appropriate class-wide and individual remedies sought in this action.

95.     In order to gain relief for herself, as well as for other class members, Plaintiff will first establish the existence of systemic gender discrimination as the premise for the relief that she seeks.

96.     Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the proposed class of female professors is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representative, the proposed class, and Defendant.

**C.     Numerosity and Impracticability of Joinder**

97.     The class which the Class Representative seeks to represent is too numerous to make joinder practicable. Upon information and belief, the proposed class consists of approximately 80 current and former professors during the liability period.

98.     The University's pattern or practice of retaliation also makes joinder

impracticable by discouraging female professors from pursuing claims.

**D.    Common Questions of Law and Fact**

99.    The prosecution of the claims of the Class Representative will require the adjudication of numerous questions of law and fact common to both her individual claims and those of the class she seeks to represent.

100.    The common questions of law include, *inter alia*: (a) whether the University has engaged in a pattern and practice of unlawful, systemic gender discrimination in its compensation and promotion policies, practices and procedures, and in the general terms and conditions of work and employment; (b) whether the failure to institute meaningful compensation guidelines results in gender-based pay discrimination in violation of Title VII and the EPA; (c) whether the University's promotion practices result in unlawful discrimination in promotions in violation of Title VII; and (d) whether the University is liable for a continuing systemic violation of Title VII, and/or other statutes; and (e) a determination of the proper standards for proving a pattern or practice of discrimination by the University against its female professors in the College of Science.

101.    The common questions of fact include, *inter alia*: whether the University has (a) systematically, intentionally or knowingly placed female professors in job titles or classifications lower than similarly-situated male professors; (b) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (c) through the use of that compensation system compensated female professors less than similarly-situated males in salary, bonuses, and/or other perks; (d) systematically, intentionally or knowingly compensated female professors less than similarly-situated males; (e) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (f) through use of that promotion system precluded or delayed the promotion of female professors into higher level jobs traditionally held by male professors; (g) failed to adequately or meaningfully train, coach, or discipline senior management on EEO principles and compliance; and (h) failed to

adequately address and respond to complaints and other indicators of gender bias and discrimination.

102.   The employment policies, practices, and procedures to which the Class Representative and the class member are subjected are set at the University level and apply universally to all class members. These employment policies, practices and procedures apply to all professors in the College of Science.

103.   Throughout the liability period, a disproportionately large percentage of the Professors in the College of Science have been male.

104.   The systemic means of accomplishing such gender-based stratification include, but are not limited to, the University's promotion and compensation policies, practices and procedures. These policies, practices and procedures all suffer from a lack of transparency, adequate quality standards and controls; sufficient implementation metrics; HR review; and opportunities for redress or challenge. As a result, female professors are compensated, developed, and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward professors.

105.   As a result, male professors have advanced and continue to advance more rapidly to better and higher-paying positions than female professors. The University's policies, practices, and procedures have had an adverse impact on female professors seeking selection for, or advancement to, better and higher-paying positions.

**E.     Typicality of Claims and Relief Sought**

106.   The claims of the Class Representative are typical of the claims of the class. The relief sought by the Class Representative for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the class.

107.   Like all members of the class, the Class Representative is a professor who worked at the University during the liability period.

108.   Discrimination in promotion and compensation affects the Class Representative and all class members in the same or similar ways.

109.   The University has failed to create adequate incentives for its management to comply with its own policies and equal employment opportunity laws regarding each of the employment policies, practices, and procedures referenced in this Complaint, and has failed to discipline adequately its managers and other employees when they violate the University policy or discrimination laws. These failures have affected the Class Representative and the class members in the same or similar ways.

110.   The relief necessary to remedy the claims of the Class Representative is the same as that necessary to remedy the claims of the class members in this case.

111.   The Class Representative seeks the following relief for her individual claims and for those of the members of the proposed class: (a) declaratory relief that that Defendant's employment policies, practices, and/or procedures challenged herein are illegal; (b) a permanent injunction against such continuing discriminatory conduct; (c) back pay, front pay, and/or other equitable remedies necessary to make the female professors whole from Defendant's past discrimination; (d) compensatory damages; (e) pre- and post-judgment interest; and (f) attorneys' fees, costs, and expenses.

**F.     Adequacy of Representation**

112.   The Class Representative's interests are co-extensive with those of the members of the proposed class which she seeks to represent in this case. The Class Representative seeks to remedy the University of Arizona College of Science's discriminatory employment policies, practices, and procedures so that female professors will no longer be prevented from advancing into higher-paying and/or more desirable higher-level positions. Plaintiff is willing and able to represent the proposed class fairly and vigorously as she pursues her individual claims in this action.

113.   The Class Representative has retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interests, experience, and resources of Plaintiff's counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy

of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.   Requirements of Rule 23(b)(2)

114.   The University has acted on grounds generally applicable to the Class Representative and the class by adopting and following systemic policies, practices, and procedures which are discriminatory: gender discrimination is the College of Science's standard operating procedure rather than a sporadic occurrence. The University has refused to act on grounds generally applicable to the class by, *inter alia*: (a) failing to pay female professors on par with similarly-situated male employees; and (b) denying female professors promotion and advancement opportunities comparable to male employees.

115.   The systemic means of accomplishing such gender-based stratification include, but are not limited to, the University's development, promotion, advancement, and compensation policies, practices and procedures. These practices and procedures all suffer from a lack of: transparency, adequate quality standards and controls; sufficient implementation metrics; upper management; HR review; and opportunities for redress or challenge. As a result, employees are compensated, developed, and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward employees.

116.   The University's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

117.   Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female professors at the University. Further, a class-wide liability finding and associated injunctive relief is an essential predicate for the Class Representative's and the class members' entitlement to monetary and non-monetary remedies at Stage II of a class discrimination trial.

### H.   Requirements of Rule 23(b)(3)

118.   The common issues of fact and law affecting the claims of the Class

Representative and proposed class members, including, but not limited to, the common issues previously identified herein, predominate over any issues affecting only individual claims. These issues include whether the University has engaged in gender discrimination against female professors by (a) paying female professors less than their male counterparts and (b) denying female professors equal promotion and advancement opportunities.

119.   A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

120.   The cost of proving the University's pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to prosecute their claims individually.

121.   By virtue of the pattern and practice of discrimination at the University, Class Representative and class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, reinstatement, compensatory damages, and other damages.

122. In the alternative, the Court should grant partial certification of common liability issues under Rule 23(c)(4).

**VI.     Collective Action Allegations (Equal Pay Act)**

123.   The University has engaged in systemic gender discrimination against its female professors in the College of Science.  The University has caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices and procedures, including but not limited to common compensation and performance management policies, and centralized decision-making in the Dean of the College of Science.

124.   Dr. Miranda re-alleges and incorporates by reference each and every allegation in the previous paragraphs alleging common practices and procedures resulting in unequal pay earned by female professors in the College of Science.

125.   Dr. Miranda brings collective claims alleging violations of the EPA, as a collective action pursuant to 20 U.S.C. § 216(b) on behalf of all members of the EPA

Collective Action Class. The EPA Collective Action Class consists of all female employees who are or have been employed by Defendant as a professor in the College of Science going back three years from the dates they join this action, plus any additional tolling ordered by the Court.

126.    Dr. Miranda seeks to represent all female professors in the College of Science and maintains that they were paid less than male professors in jobs requiring substantially equal skill, effort, and responsibility.  The systemic gender discrimination described in this Complaint has been, and is, continuing in its nature.

127.    Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) because Plaintiff's claims are similar to the claims of the EPA Collective Action Class.

128.    Dr. Miranda and the members of the EPA Collective Action Class are similarly situated under the EPA because they are subject to Defendant's common compensation policies, practices, and procedures are centralized decision-making that resulted in unequal pay based on sex.  Because of these common practices, Defendant failed to compensate female professors at a level commensurate with male professors who perform substantially equal work in equivalent job positions.

## COUNT 1

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EPA, 20 U.S.C. §§ 206(d), 216(b)

### DENIAL OF EQUAL PAY FOR EQUAL WORK

### (On Behalf of Plaintiff, in Her Individual and Representative Capacities, and the EPA Collective Action Class)

129.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as is fully set forth herein.

130.    This Count is brought on behalf of Plaintiff in her individual and representative capacities, and EPA Collective Action Plaintiffs.

131.    Defendant has discriminated against Plaintiff and the EPA Collective Action

Class in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.* as amended by the EPA. Defendant has paid Plaintiff and the EPA Collective Action Class less than similarly-situated male colleagues performing equal work in comparable job positions, which require equal skill, effort, and responsibility and which are performed under similar working conditions.

132.   Defendant subjected Plaintiffs and the EPA Collective Action Class to common discriminatory pay policies and other forms of discrimination affecting pay.

133.   The differential in pay between male and female employees was not due to seniority, merit, or quantity or quality of production, but rather was due to gender.

134.   Defendant caused, attempted to cause, contributed to, or caused the continuation of the wage rate discrimination based on sex in violation of the EPA. Moreover, the foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

135.   As a result of Defendant's conduct alleged in this Complaint, Plaintiff and the EPA Collective Action Class have suffered and will continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

136.   By reason of Defendant's discrimination, Plaintiff and the EPA Collective Action Class are entitled to all legal and equitable remedies available for violations of the EPA including back pay, liquidated damages prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## COUNT 2

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. §§ 2000e, *et seq.*

### GENDER DISCRIMINATION – PAY

### (On Behalf of Plaintiff in Her Individual and Representative Capacities,

### and the Rule 23 Class)

137.   Plaintiff Miranda re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint.

138.   Defendant has discriminated against Plaintiff Miranda in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting her to different treatment on the basis of her gender, particularly by paying her less than her male counterparts.

139.   As a result of Defendant's conduct alleged in this Complaint, Plaintiff Miranda has suffered and will continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

140.   By reason of Defendant's discrimination, Plaintiff Miranda is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, compensatory damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 42 U.S.C. § 2000e-5(k).

<u>**COUNT 3**</u>

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**

**42 U.S.C. §§ 2000e, *et seq.***

**GENDER DISCRIMINATION – PROMOTION**

**(On Behalf of Plaintiff in Her Individual and Representative Capacities,**

**and the Rule 23 Class)**

141.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

142.   This Count is brought on behalf of Dr. Miranda and all members of the class.

143.   Defendant has discriminated against Plaintiff and all members of the class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender.  Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

144.   Defendant has discriminated against Plaintiff and all members of the class

by treating them differently from and less preferably than similarly-situated male employees, and by subjecting them to discriminatory denials of promotions in violation of Title VII.

145.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff and all members of the class.

146.    By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of Plaintiff and the members of the class, Plaintiff and the members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

147.    As a result of Defendant's conduct alleged in this complaint, Plaintiff and the members of the class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

148.    Defendant's policies, practices and/or procedures have produced a disparate impact on Plaintiff and members of the class with respect to the terms and conditions of their employment.

149.    By reason of Defendant's discrimination, Plaintiff and the members of the class are entitled to all remedies available for violations of Title VII.

150.    Attorneys' fees should be awarded under 42. U.S.C. § 2000e-5(k).

## COUNT 4

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS**

**AMENDED BY THE EPA, 29 U.S.C. §§ 215(a)(3), 216(b)**

**RETALIATION**

**(On Behalf of Plaintiff Katrina Miranda)**

151.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint.

152.    Plaintiff Miranda engaged in protected activity under the EPA by

complaining to Defendant about gender discrimination in compensation.

153. Because of these complaints, Defendant, among other retaliatory conduct, removed Plaintiff from teaching certain courses and reduced her laboratory space – limiting her ability to pursue her research and perform her essential job functions.

154. By reason of Defendant's discrimination, Plaintiff Miranda is entitled to all legal and equitable remedies available for violations of the EPA including back pay, liquidated damages, prejudgment interest, attorneys' fees, costs, and other relief pursuant to 29 U.S.C. § 216(b).

### COUNT 5

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**

**42 U.S.C. §§ 2000e,** *et seq.*

**RETALIATION**

**(On Behalf of Plaintiff Katrina Miranda)**

155. Plaintiff Miranda re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this complaint.

156. Plaintiff Miranda has engaged in protected activity under Title VII by repeatedly complaining to Defendant about gender discrimination in compensation, promotion, and other deferential treatment.

157. Because of these complaints, Defendant, among other retaliatory conduct, removed Plaintiff from teaching course and reduced her laboratory space in a manner detrimental to her career and professional pursuits.

158. By reason of Defendant's discrimination, Plaintiff Miranda is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, compensatory damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 42 U.S.C. § 2000e-5(k).

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on behalf of the EPA Collective Action Class, pray that this Court:

A.  Certify the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23(a) on behalf of the proposed Plaintiff class, and designate Dr. Miranda as the representative of this class and her counsel of record as class counsel;

B.  Certify the claims in Count 1 as a collective action under the EPA on behalf of Plaintiff and the EPA Collective Action Class; designate Plaintiff as representative of the EPA Collective Action Class; promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the Collective Action, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and toll the statute of limitations on the claims of all members of the Collective from the date the original Complaint was filed until the Collective Action members are provided with reasonable notice of the pendency of this action and fair opportunity to exercise their right to opt in as Collective Action Plaintiffs;

C.  Declare and adjudge that Defendant's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Plaintiff, Rule 23 Class members, and EPA Collective members.

D.  Issue an injunction against Defendant and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with it from engaging in any conduct violating the rights of Plaintiff, and those similarly situated as secured by the Equal Pay Act and Title VII, and order such injunctive relief as will prevent Defendant from continuing its discriminatory practices and from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

E.  Order Defendant to adjust the wage rates and benefits for members of the Rule 23 Class and EPA Collective to the level that they would be enjoying but for Defendant's discriminatory policies, practices, and/or procedures;

F.  Award back pay, front pay, lost benefits, and other damages for lost compensation and job benefits suffered by Plaintiff, Rule 23 Class members, and EPA

Collective members;

G. Award compensatory and liquidated damages Plaintiff, Rule 23 Class members, and EPA Collective members;

H. Order Defendant to make Plaintiff, Rule 23 Class members, and EPA Collective members whole by providing them with any other monetary and affirmative relief, including relief necessary to compensate Plaintiffs for the harm incurred to their reputation and for emotional distress;

I. Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Plaintiff, Rule 23 Class members, and EPA Collective members;

J. Award Plaintiff, Rule 23 Class members, and EPA Collective members all pre-judgment interest and post-judgment interest available under law;

K. Award Plaintiff, Rule 23 Class members, and EPA Collective members any other appropriate equitable relief, including equitable relief necessary to repair damage caused by Defendant to Plaintiffs' reputations;

L. Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that the Defendant has remedied the practices complained of herein and such practices are determined to be in full compliance with the law; and

M. Award additional and further relief as this Court may deem just and proper.

## VIII.   JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by jury.

1  Dated: November 30, 2018                    Respectfully submitted,

2                                              /s/ Merle Joy Turchik

3                                              Merle Joy Turchik (AZ Bar No. 011130)
                                               TURCHIK LAW FIRM, P.C.
4

5                                              David Sanford (*Pro Hac Vice*
                                               *forthcoming*)
6                                              Kate Mueting (*Pro Hac Vice forthcoming*)
7                                              Andrew Melzer (*Pro Hac Vice*
                                               *forthcoming*)
8                                              Christopher Yandel (*Pro Hac Vice*
                                               *forthcoming*)
9                                              SANFORD HEISLER SHARP, LLP
10

11                                             *Attorneys for Plaintiff and the EPA*
                                               *Collective Action Class*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[*Continued from Caption Page*]

Andrew Melzer (NY Bar No. 4270682, *Pro Hac Vice forthcoming*)
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Fl
New York, NY 10019
amelzer@sanfordheisler.com
Telephone: (646) 402-5657
Facsimile: (646) 402-5651

Kate Mueting (DC Bar No. 988177, *Pro Hac Vice forthcoming*)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue SE, Suite 300
Washington, D.C. 20003
kmueting@sanfordheisler.com
Telephone: (202) 499-5206
Facsimile: (202) 499-5199

Christopher Yandel (CA Bar No. 319961, *Pro Hac Vice forthcoming*)
SANFORD HEISLER SHARP, LLP
111 Sutter Street, Suite 975
San Francisco, CA 94104
cyandel@sanfordheisler.com
Telephone: (415) 795-2014
Facsimile: (415) 795-2021

*Attorneys for Plaintiff and the EPA Collective Action Class*